No. 26-1033

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

Roderick Johnson,

Appellant,

v.

City of Reading, Angel Cabrera, Eileen K. Cardile, Personal Representative of the Estate of Bruce H. Dietrich, County of Berks, Mark C. Baldwin and Edward D. Ratajack, Executor of the Estate of Joseph Stajkowski,

Appellees.

---

On Appeal from the United States District Court for the Eastern District of Pennsylvania (J. Gallagher) at Docket No. 21-04860

---

**REPLY BRIEF OF APPELLANT**

---


William M. McSwain
John J. Soroko
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA 19103
(215) 979-1000

Eric A. Boden
DUANE MORRIS LLP
40 Lake Center Drive
401 Route 73 N, Ste. 200
Marlton, NJ 08053
(856) 874-4200

Andrew M. Green
Law Off. Barry M. Wax
701 Brickell Ave. Ste. 1550
Miami, FL 33131
*Counsel for Appellant*

John M. Pierce
JOHN PIERCE LAW
21550 Oxnard Street,
3rd Flr.
Woodland Hills, CA
91367
(321) 961-1848

## TABLE OF CONTENTS

**Page**


ARGUMENT ........................................................................................................ 1

I. BERKS COUNTY'S OPPOSITION BRIEF AVOIDS THE MERITS OF MR. JOHNSON'S *MONELL* CLAIM AGAINST THE COUNTY AND ESSENTIALLY WAVES THE WHITE FLAG IN SURRENDER ........................................................................................ 1

II. A JURY SHOULD DETERMINE WHETHER THE CITY OF READING AND ITS DETECTIVES – CABRERA AND DEITRICH – VIOLATED MR. JOHNSON'S CIVIL RIGHTS ........................................ 8

a. *The District Court's Decision Granting Summary Judgment in Favor of the City of Reading on Mr. Johnson's* Monell *Claim for Municipal Liability Should Be Reversed.* ............................................... 9

b. *The District Court's Decision Granting Detectives Cabrera and Dietrich Qualified Immunity on Mr. Johnson's Fourteenth Amendment Fair Trial Claims in Counts IV and V Is Based on a Misreading of* Gibson *and Should Be Reversed* ................................. 14

c. *Mr. Johnson's Fabrication of Evidence Claims in Counts IV and V Should Be Decided by a Jury.* ........................................................ 16

d. *A Jury Should Determine Whether Mr. Johnson Is Entitled to Punitive Damages* ...................................................................... 20

CONCLUSION .................................................................................................. 22

COMBINED CERTIFICATIONS ...................................................................... 23

CERTIFICATE OF SERVICE ........................................................................... 24

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Black v. Montgomery Cnty.*
835 F.3d 358 (3d Cir. 2016) .....17

*City of Canton v. Harris*
489 U.S. 378 (1989).....13

*City of St. Louis v. Praprotnik*
485 U.S. 112 (1988).....4

*Debiec v. Cabot Corp.*
352 F.3d 117 (3d Cir. 2003) .....19

*Dennis v. City of Philadelphia*
19 F.4th 279 (3d Cir. 2021) .....7

*Fraternal Ord. of Police, Lodge 1 v. City of Camden*
842 F.3d 231 (3d Cir. 2016) .....19

*Gibson v. Superintendent of N.J. Department of Law & Public Safety–Division of State Police*
411 F.3d 427 (3d Cir. 2005) .....*Passim*

*Gillette v. Delmore*
979 F.2d 1342 (9th Cir. 1992) .....4

*Halsey v. Pfeiffer*
750 F.3d 273 (3d Cir. 2014) ..... 16-18

*Hill v. Borough of Kutztown*
455 F.3d 225 (3d Cir. 2006) .....4

*InterVest, Inc. v. Bloomberg, L.P.*
340 F.3d 144 (3d Cir. 2003) .....16

*Jackson v. Univ. of Pittsburgh*
826 F.2d 230 (3d Cir. 1987) .....20

*Kyles v. Whitley*
514 U.S. 419 (1995)....10

*McMillian v. Monroe County*
520 U.S. 781 (1997)....4

*Nelson v. Adams USA, Inc.*
529 U.S. 460 (2000)....3

*Pembaur v. City of Cincinnati*
475 U.S. 469 (1986)....7

*Stanley v. City of Sanford, Fla.*
606 U.S. 46 (2025)....1

*Yee v. City of Escondido*
503 U.S. 519 (1992)....7

**OTHER AUTHORITIES**

Fed. R. Evid. 801(d)(2)....19

Fed. R. Evid. 803(8)(A)(ii)....19

## ARGUMENT

### I. BERKS COUNTY'S OPPOSITION BRIEF AVOIDS THE MERITS OF MR. JOHNSON'S *MONELL* CLAIM AGAINST THE COUNTY AND ESSENTIALLY WAVES THE WHITE FLAG IN SURRENDER.

The County of Berks ("Berks County") Opposition Brief takes an interesting tack: it basically says that it does not have to bother addressing the merits because Roderick Johnson ("Mr. Johnson") loses on waiver – namely, that his appeal is based on "theories [that] Mr. Johnson never asked [the district court] to decide." Berks Opp. Br. at 2. More specifically, Berks County claims that "Mr. Johnson presents three novel arguments: (1) that the legal conclusions made in his post-conviction proceedings necessarily 'preclude' the District Court from assessing whether the record here establishes a constitutional violation . . . (2) that DA Baldwin possessed final policymaking authority over discovery practices . . . and (3) that DA Baldwin's failure to disclose favorable evidence constituted official County policy under the single-[incident] doctrine . . . ." *Id.* at 14. Because these are supposedly new arguments on appeal, Berks County states that "this Court 'may of course determine that under its usual rules of waiver or forfeiture, it will not consider those arguments.'" *Id.* (quoting *Stanley v. City of Sanford, Fla.*, 606 U.S. 46, 64 (2025)).

Berks County's position here is simply foolish. Mr. Johnson did not even make the first argument and there is nothing "novel" about the second and third

arguments. Berks County's decision to avoid the merits is akin to giving up and waving the white flag in this appeal.

*First*, as a matter of clarification, Mr. Johnson never argued in the district court or on appeal that the district court was precluded from assessing whether the record here establishes a constitutional violation. Instead, he pointed out the obvious fact that there *was* a constitutional violation – how else was he released from prison? – and that if the district court were to conclude otherwise, there should be some explanation of why. There is none. And really, how could there be? As Mr. Johnson put it in his Opening Brief, "it is very difficult – if not impossible – to make any sense of the district court's statement" that there was no underlying constitutional violation. Opening Br. at 27.

Regardless, it is nonsensical for Berks County to assert that Mr. Johnson "never argued below that the summary judgment record established an underlying constitutional violation." Berks Opp. Br. at 17. To the contrary, Mr. Johnson's Summary Judgment Motion expressly argued that "[t]here is no dispute that Roderick Johnson's due process right to discovery was violated, thereby violating his right to a fair trial," and that "[i]t is undisputed by all parties that Roderick Johnson suffered a significant due process violation when the Commonwealth failed to disclose *Brady* material." ECF No. 121-1 at 1, 3. Indeed, Mr. Johnson pressed

these arguments in his Opposition, ECF No. 134 at 3, 5–7, and Reply, identifying four rulings by three courts finding significant *Brady* violations. ECF No. 149 at 1.

Furthermore, the district court decided this issue at summary judgment, ensuring the issue was preserved for appeal. *See generally* JA6–29. In its grant of summary judgment for Appellees, the district court acknowledged Plaintiff's claims that "his constitutional rights were violated due to evidence being suppressed," (JA10), which stemmed from "prosecutors knowingly [withholding] exculpatory and impeachment evidence, [and] manipulat[ing] witness testimony," *id.*, and in turn enabled Mark Baldwin ("DA Baldwin") to secure a conviction through "unconstitutional means," (JA26.) In short, the district court was on notice of the issue, reviewed the parties' arguments and found – wrongly – that no constitutional violation had occurred. (JA15–18); *see also Nelson v. Adams USA, Inc.*, 529 U.S. 460, 469 (2000) (an issue is preserved where the lower court is "fairly put on notice as to the substance of the issue," which "does not demand the incantation of particular words").

*Second,* Mr. Johnson repeatedly argued below that DA Baldwin possessed final policymaking authority over discovery practices. From the outset, Mr. Johnson pleaded that Berks County acted "by and through its final policy makers, inclusive of defendant Mark Baldwin," in maintaining a policy of "deliberately withholding evidence." (JA107 at ¶ 232.) His Summary Judgment Motion pressed the same

theory: "based upon the actions of Mark Baldwin, who was the policy maker for the office," the District Attorney's Office "had a de facto custom and policy to not disclose evidence." ECF No. 121-1 at 8–9.

Mr. Johnson's Opposition to Berks County's Summary Judgment Motion likewise expressly invoked the final policymaker theory – under which the wrongdoer "was an official with final policymaking authority and [] the challenged action itself was an act of official governmental policy which was the result of a deliberate choice made from among various alternatives," ECF No. 134 at 10 (citing *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992)) – and then applied it: "Baldwin was the final policymaker for the Berks County District Attorney's Office. His office had no policy or training with regard to disclosing evidence to the accused." ECF No. 134 at 12.

Mr. Johnson also invoked *McMillian v. Monroe County*, 520 U.S. 781 (1997), to argue that DA Baldwin's "edicts or acts . . . may fairly be said to represent official policy," ECF No. 134 at 11, and relied on *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988), and *Hill v. Borough of Kutztown*, 455 F.3d 225, 245–46 (3d Cir. 2006), to argue that DA Baldwin "was the boss and dictated policy in that area of Berks County's business," ECF No. 134 at 12. Mr. Johnson's Supplemental Opposition to Summary Judgment further identified DA Baldwin as "the County's final policymaker for prosecutorial practices." ECF No. 169 at 5.

Moreover, Berks County itself put DA Baldwin's authority at issue, arguing at summary judgment that he *lacked* final policymaking authority under the "County Code" and the Rules of Professional Conduct. ECF No. 123 at 11–14. Having itself litigated the question below, Berks County cannot now claim it was never in the case.

*Third*, Mr. Johnson absolutely did argue below that DA Baldwin's failure to disclose favorable evidence constituted official County policy. For example, in his Supplemental Opposition to Summary Judgment, he argued that DA Baldwin "established a policy . . . characterized by obfuscation and concealment . . . that [was] so fundamentally misaligned with clearly established law governing discovery obligations." ECF No. 169 at 4–5. More specifically, the policy was that if the witness in question was "not arrested," then the defense "can't impeach" and "gets nothing."[1] *Id.* at 6. That "policy is deeply flawed on multiple levels, most notably,

[1] The impeachment evidence that was withheld, as Berks County notes, included "a letter and five police reports allegedly impeaching the trial testimony of third-party witness George Robles." Berks Opp. Br. at 4. On the same page in its Brief, Berks County euphemistically states that Mr. Johnson, during the pendency of his third petition under Pennsylvania's Post Conviction Relief Act, "came into possession" of these materials – as if they were suddenly found or dropped from the sky. *See also* Reading Opp. Br. at 10 (stating vaguely that Mr. Johnson "came into possession" of the impeachment material while his third petition for post-conviction relief was pending). These materials, which ultimately set Mr. Johnson free, were specifically withheld by the government for a decade, until 2007. They were produced only after "many motions filed by Mr. Johnson to compel production of

as acknowledged by every court to have reviewed Mr. Johnson's wrongful convictions, in its complete disregard for bias as one of the most powerful forms of impeachment evidence." *Id*.

To the extent that Berks County might be trying to suggest that Mr. Johnson's arguments on appeal are not *exactly* the same as those he pursued below because he focused more on a "single incident" theory (as opposed to a pattern of conduct by DA Baldwin) on appeal than he did in the district court, this is irrelevant. As an initial matter, Berks County itself repeatedly acknowledges that a single incident theory *was* addressed below. Berks Opp. Br. at 8 (stating that, on summary judgment, Mr. Johnson's theory of municipal liability was based on "a single-incident claim that Berks County was deliberately indifferent by failing to train prosecutors and law enforcement regarding their disclosure obligations"); *id.* at 9 (stating that, on summary judgment, Mr. Johnson "doubled-down on the same single-incident theory, asserting that the County acted with deliberate indifference by failing to implement adequate disclosure training, production protocols, supervisory measures, and other safeguards"); *id.* at 21 (noting that in the district court, Mr. Johnson "chose to litigate a single-incident failure-to-train theory"); *id.* at

exculpatory evidence" in his federal *habeas corpus* action, which the court granted. Opening Br. at 14.

23 (noting that Mr. Johnson's arguments below "depended upon the narrow 'single-incident' form of deliberate indifference").[2]

Even if a single incident theory had not been specifically addressed below, that would not mean that Mr. Johnson has waived the claim that Berks County had a policy – determined by DA Baldwin – of not disclosing favorable evidence to the accused. Instead, it would simply mean that Mr. Johnson has refined his arguments on appeal, which is a routine feature of appellate advocacy. Indeed, as this Court has explained, the parties may "place greater emphasis" on or "more fully explain an argument on appeal." *Dennis v. City of Philadelphia*, 19 F.4th 279, 287 (3d Cir. 2021). And additional authority – including that in *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), that a single decision may constitute policy – does not convert a preserved claim into something brand new. *E.g.*, *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992) ("Once a [] claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below.").

[2] The Opposition Brief of Appellees City of Reading, et al. also acknowledges that a single incident theory was presented below. Reading Opp. Br. at 37 (noting that "[t]he District Court considered and rejected a single incident theory").

For the foregoing reasons, this Court should reverse the district court's grant of summary judgment in favor of Berks County on the *Monell* claim for municipal liability in Count II.

## II. A JURY SHOULD DETERMINE WHETHER THE CITY OF READING AND ITS DETECTIVES – CABRERA AND DIETRICH – VIOLATED MR. JOHNSON'S CIVIL RIGHTS.

Although their scattershot brief is difficult to follow, the Opposition of Appellees City of Reading and its Detectives ("Reading") essentially argues that the *Monell* claim against the City in Count I cannot survive because (a) there is no underlying constitutional violation because Detectives Cabrera and Dietrich did not have a duty to turn over impeachment evidence to the prosecutor until 2005, when this Court decided *Gibson* and (b) even if there were such a duty at the time of Mr. Johnson's convictions, Mr. Johnson's failure-to-train theory of municipal liability still fails because there were no facts in the record to support the theory that a lack of training was likely to result in the constitutional violations. Reading Opp. Br. at 33–41.

As discussed below, the *Monell* claim against the City of Reading should survive because (a) a proper reading of *Gibson* demonstrates that Cabrera and Dietrich *did* have a duty to turn over impeachment evidence at the time of Mr. Johnson's trials and (b) there is plenty of evidence in the record for the failure-to-train theory of municipal liability to go to a jury.

As to the Fourteenth Amendment fair trial claims against Detectives Cabrera and Dietrich in Counts IV and V, Reading's Opposition argues that the detectives are entitled to qualified immunity – based on the same foregoing misreading of *Gibson*. *Id.* at 21–29. As to the fabrication of the evidence claims against Cabrera and Dietrich, also in Counts IV and V, Reading's Opposition, like the district court opinion, improperly discounts or ignores the record evidence and states that there is no evidence to support them. *Id.* at 41–47. Finally, Reading's Opposition erroneously alleges that Mr. Johnson has waived his claim for punitive damages. *Id.* at 47–48.

*a. The District Court's Decision Granting Summary Judgment in Favor of the City of Reading on Mr. Johnson's* Monell *Claim for Municipal Liability Should Be Reversed.*

The first step in the *Monell* framework is to determine if there is an underlying constitutional violation. In short, did Detectives Cabrera and Dietrich violate Mr. Johnson's constitutional right to a fair trial by withholding material exculpatory and impeachment evidence? The answer to this question hinges on the proper interpretation of this Court's decision in *Gibson v. Superintendent of N.J. Department of Law & Public Safety–Division of State Police* ("*Gibson*"), 411 F.3d 427 (3d Cir. 2005).

Reading's Opposition maintains that the detectives could not have violated Mr. Johnson's right to a fair trial because it was not until 2005, with the issuance of

*Gibson*, that the detectives had a duty to disclose impeachment evidence to the prosecutor. Reading Opp. Br. at 35–37. This is, simply stated, a misinterpretation of *Gibson*. As Mr. Johnson has already argued in his Opening Brief, the Supreme Court's decision in *Kyles v. Whitley*, 514 U.S. 419 (1995), "clearly established that law enforcement officers violate the Constitution by knowingly withholding *Brady* material from prosecutors." Opening Br. at 47.

Because that is what happened here, there is an underlying constitutional violation for purposes of *Monell.* The record abounds with evidence that the detectives knowingly withheld evidence. DA Baldwin testified that he requested the entire investigative file, (JA603), yet did not receive the Robles reports, which he claimed "had not been disclosed by the Reading Police Department to [him]" and which he did not discover until 2007. (JA604.) DA Baldwin further stated to the *Martinez* court prior to trial that he had no record of Robles being involved in criminal activity. (JA85–86 at ¶ 150.) That testimony supports the inference that Cabrera and Dietrich withheld the reports from the prosecution. Detective Vega's testimony reinforces that inference: he claimed not to have seen Cabrera's reports implicating Robles before the *Martinez* trial. (JA701–02); *see also* Opening Br. at 36–37 (discussing how the detectives did not provide impeachment material to the prosecution). At the very least, there is a genuine dispute of material fact about

whether Cabrera and Dietrich knowingly withheld exculpatory evidence – an issue that must be resolved by a jury.

The proper interpretation of *Gibson* is driven home by the insightful amicus brief filed by the National Innocence Project and the Pennsylvania Innocence Project, submitted by lead counsel, Mitchell S. Goldberg, former Chief Judge of the U.S. District Court for the Eastern District of Pennsylvania. Mr. Johnson incorporates here the arguments set forth in that brief.

The amicus brief explains in detail how, after *Kyles* in 1995, law enforcement officers had "a known duty to disclose *Brady* material to prosecutors, who in turn have a responsibility to disclosure exculpatory evidence to the defense." Amicus Br. at 4–5. Thus, "[a]fter *Kyles* was decided in 1995, all reasonable law enforcement officers would have known that they had an affirmative duty to share exculpatory evidence with the prosecution so that the prosecutor can assess it and share it with the defense." *Id.* at 7.

This Court's ruling in *Gibson* did not change this. As the amicus brief states, "[f]or one thing, it could not; this Court cannot overrule Supreme Court precedent." *Id.* Indeed, *Gibson* recognized that the Supreme Court "'settle[d]' the question of whether withholding exculpatory information known only to the police can violate due process 'when it decided *Kyles*' in 1995." *Id.* at 8 (quoting *Gibson*, 411 F.3d at 443–44).

Critically, the conviction at issue in *Gibson* occurred in 1994, before *Kyles.* While the *Gibson* court applied qualified immunity, it did so because the law "'was not clearly established in this Circuit at the time of Gibson's conviction.'" *Id.* (quoting *Gibson* at 444). Thus, "[b]ecause *Gibson* dealt with the question of qualified immunity for the withholding of exculpatory information by police officers in 1994," its holding is consistent with the conclusion that the law *was* clearly established by 1995 with the issuance of *Kyles*. *Id.*

Moreover, every single additional Circuit to consider the issue (six in all) has concluded that the law was clearly established even *prior* to *Kyles* "that police officers have a duty to disclose exculpatory evidence to prosecutors – and through them, to the defense . . . ." *Id.* at 10. In sum, this Court should reject Reading's (as well as the district court's) extension of *Gibson* to post-*Kyles* cases, like this one. As the amicus brief puts it, "[r]egardless of whether *Gibson* correctly decided that the relevant law was not clearly established in 1994, its holding is limited by its own terms to prosecutions that predated *Kyles*." *Id.* at 12.

It is true that there are district court decisions in this Circuit that, like the district court below, misinterpret *Gibson* as holding that the law was not clearly established until 2005. Reading Opp. Br. at 23–24. But this merely highlights that this Court now has an opportunity to affirm the proper interpretation of *Gibson* and, at the same time, prevent any further injustice that denies recourse to defendants,

like Mr. Johnson, who had their right to a fair trial violated before 2005. Notably, this proper interpretation of *Gibson* is consistent with the views of every other Circuit to consider the issue of whether the law was clearly established by 1995, or even earlier.

Next, once there is an underlying constitutional violation, there is plenty of evidence in the record for the failure-to-train theory of municipal liability to go to a jury. As explained in Mr. Johnson's Opening Brief, under Supreme Court precedent, "plaintiff needs to show that failure to provide the identified training would likely 'result in the violation of rights' such that 'the need for more or different training [was] so obvious.'" Opening Br. at 44 (quoting *City of Canton v. Harris,* 489 U.S. 378, 390 (1989)). As the record shows, the City of Reading essentially had *no* training on the most fundamental *Brady* disclosure obligations, such as identifying favorable evidence or implementing protective measures to ensure the disclosure of exculpatory or impeachment material. *Id.* at 44–45 (detailing evidence in the record of the lack of training). It should be fairly "obvious" that having no training at all on such basic concepts would likely "result in the violation of constitutional rights." At the very least, this is a question for the jury and should not have been resolved against Mr. Johnson on summary judgment.

Finally, even if this Court were to conclude that the law was not clearly established until 2005, the *Monell* claim against the City of Reading still survives

because Detectives Cabrera and Dietrich would have had an obligation to disclose the *Brady* material in 2005, during Mr. Johnson's PCRA proceedings – which they did not. *See* Opening Br. at 48–50 (discussing the obligation to disclose *Brady* material post-conviction). Thus, for *Monell* purposes, there was an underlying constitutional violation, even in 2005. The detectives' post-conviction obligations were discussed below in Mr. Johnson's Supplemental Opposition to Summary Judgment, ECF No. 169 at 10–12, and thus there is no merit to Reading's suggestion that this argument is forfeited, Reading Opp. Br. at 29–32.

For the foregoing reasons, the district court decision on Count I for municipal liability against the City of Reading should be reversed.

b. *The District Court's Decision Granting Detectives Cabrera and Dietrich Qualified Immunity on Mr. Johnson's Fourteenth Amendment Fair Trial Claims in Counts IV and V Is Based on a Misreading of* Gibson *and Should Be Reversed.*

Mr. Johnson argued below that Detectives Cabrera and Dietrich violated his due process right to a fair trial by withholding material exculpatory and impeachment evidence. Reading relies on the district court's determination that Cabrera and Dietrich are entitled to qualified immunity because "there was no duty on *law enforcement* to disclose evidence favorable to the accused to the prosecutor" between 1996 and 1998. (JA21) (emphasis in original); *see* Reading Opp. Br. at 25–29. This determination, however, rests on the same misinterpretation of *Gibson* that

is discussed in detail above in Section II.a. Because the duty existed by 1995, the district court's decision should be reversed.

Reading erroneously claims that Mr. Johnson has "waived the issue of qualified immunity," Reading Opp. Br. at 24, based on nothing more than an off-hand comment that Cabrera and Dietrich "may" have been entitled to qualified immunity, ECF No. 169 at 10. This is by no means a concession. Mr. Johnson was merely stating that Cabrera and Dietrich "may" have been – but not necessarily were – entitled to qualified immunity.

Even if this Court were to conclude that the law was not clearly established until 2005, the fair trial claims against Cabrera and Dietrich still survive because the detectives would have had an obligation to disclose the *Brady* material in 2005, during Mr. Johnson's PCRA proceedings – which they did not. *See* Section II.a., *supra.* After *Gibson*, Cabrera's and Dietrich's continued withholding of critical materials, such as the five police reports and Robles' jailhouse letter, violated Mr. Johnson's due process rights. Opening Br. at 48–50.

Reading erroneously claims here, as well, that the "arguments concerning post-2005 conduct are forfeited" because they were first raised in Mr. Johnson's Supplemental Opposition to Summary Judgment. Reading Opp. Br. at 29–32. That this argument was addressed in supplemental briefing – which the district court expressly authorized the parties to file – is of no consequence. Moreover, the factual

record had already been developed through discovery and was before the district court. Opening Br. at 48–49.

*c. Mr. Johnson's Fabrication of Evidence Claims in Counts IV and V Should Be Decided by a Jury.*

Reading contends that summary judgment was properly granted on Mr. Johnson's Fourteenth Amendment fabrication of evidence claims because he failed to present evidence capable of supporting the claims at trial. Reading Opp. Br. at 41–47. But the district court did not lack evidence; instead, it improperly usurped the jury's role by discounting the evidence and assessing credibility. That error requires reversal.

At summary judgment, "'a court is not to weigh the evidence or make credibility determinations'; these are tasks left for the fact-finder." *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 160 (3d Cir. 2003) (citation omitted). Here, the district court did both. Opening Br. at 50–56.

A fabrication claim survives where "there is a reasonable likelihood that, without the use of that evidence, the defendant would not have been convicted." *Halsey v. Pfeiffer*, 750 F.3d 273, 294 (3d Cir. 2014). Materiality is not seriously in dispute here. The Pennsylvania Supreme Court held that "Robles' testimony was the only evidence linking Johnson to the .38 caliber gun, and that gun was the only physical evidence linking Johnson to the Banks cousins' murders." (JA519.) Robles, it concluded, "was the Commonwealth's keystone." *Id.* This Court called that

testimony "clearly pivotal." (JA489.) Like the confession in *Halsey*, Robles' testimony was the "key ingredient" of the convictions. *Halsey*, 750 F.3d at 291.

The standard to establish a triable issue of fabrication requires "'persuasive evidence supporting a conclusion that the proponents of the evidence' are aware that evidence is incorrect or that the evidence is offered in bad faith." *Black v. Montgomery Cnty.*, 835 F.3d 358, 372 (3d Cir. 2016) (quoting *Halsey*, 750 F.3d at 295). The record here supplies such evidence, including:

- Edwin Casiano swore that "Robles sold drugs for" Cabrera and Dietrich, and that Robles told him he "just picked up his drugs from them" after Casiano saw him in a police vehicle with them. (JA470–71.)
- Bryant Graham swore that Stajkowski said "Cabrera was one of the officers who would have an informant say whatever he wanted them to say, even if it wasn't true." (JA896–97.)
- Orlando Alvarado swore that Cabrera was regarded as Robles' father and that Robles would say whatever Cabrera told him to say. (JA898–900.)
- Cintron and Velazquez stated that they were coerced into testifying falsely. (JA430–31, JA460.)
- Five undisclosed police reports, most authored by or responded to by Cabrera and Dietrich, documented Robles' narcotics trafficking, firearm offenses, and lies to police. (JA222–307.) Yet at trial "Robles denied any involvement in drug dealing or gang activity." (JA492.)
- Robles himself wrote to Cabrera from jail: "I am doing everything possible to help you. Please, please help me . . . . I am begging you and Vega with my word as a man and father to be im not running just send me home please I will do anything." (JA285–86.)

This evidence is hardly "irrelevant." Reading Opp. Br. at 45. Further, Cabrera documented Robles' drug activity (JA255), and Dietrich knew that Robles was known as a large-scale drug dealer (JA894). Cabrera, however, did not tell the lead investigator, Vega. (JA714–15.)

In short, officers who knew Robles' denials were false, and who had every motive to hide their own relationship with him, instead presented him as a law-abiding witness. That is knowing use of false testimony. It is the opposite of an innocent "misidentification." *Halsey*, 750 F.3d at 295. A jury, not the district court, must assess and weigh this evidence.

Reading also insists that the district court "addressed the evidence." Reading Opp. Br. at 43. The court recited the witnesses' statements, noted that Cabrera and Dietrich were "present" for Robles' statement, and found "no evidence that Robles' statement or testimony was false, incorrect, fabricated, or developed in bad faith." (JA23–24.) But it never analyzed the Casiano, Graham, or Alvarado declarations, the five police reports, or their conflict with Robles' trial testimony. (JA22–24.) Nor did the decision so much as mention Robles' jailhouse letter, in which the Commonwealth's key witness begged Cabrera for help and promised to "do anything" in return. *Id.* A witness who offers a detective literally anything in exchange for his release has an obvious incentive to say what that detective wants to hear.

Reading further complains that Cintron and Velazquez referred to "police" and "detectives" rather than naming Cabrera or Dietrich. Reading Opp. Br. at 44. That goes to weight, which is a jury question, particularly where Cabrera witnessed Cintron's statement. By drawing inferences against the nonmovant, the district court

misapplied the summary judgment standard and usurped the factfinder's role. *See Debiec v. Cabot Corp.*, 352 F.3d 117, 128 n.3 (3d Cir. 2003).

Reading's hearsay objections also fail. Hearsay may be considered at summary judgment if it is "capable of being admiss[ible] at trial." *Fraternal Ord. of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 238 n.14 (3d Cir. 2016) (citation omitted).

Reading does not argue that any of this evidence is incapable of admission. Cabrera's and Dietrich's own statements are admissible as party-opponent admissions under Fed. R. Evid. 801(d)(2); the police reports are admissible as public records under Fed. R. Evid. 803(8)(A)(ii). The double-hearsay objection to the investigator declarations also fails. Reading Opp. Br. at 45. The inner declarants, Cintron and Velazquez, have already been subpoenaed, and the district court gave no reason in its decision to believe they will be unavailable to testify at trial. *See Camden*, 842 F.3d at 239.

Finally, Reading, like the district court, also sidesteps any meaningful engagement with Mr. Johnson's own testimony, recounted in his Opening Brief, about his unlawful narcotics dealings with Robles, Cabrera, and Dietrich. Opening Br. at 54–55. Yet a plaintiff's evidence cannot be disregarded at summary judgment simply because it comes from the plaintiff himself – a basic principle that both the

district court and Reading ignore. *See Jackson v. Univ. of Pittsburgh*, 826 F.2d 230, 236 (3d Cir. 1987).

Viewed in Mr. Johnson's favor, the record permits a reasonable jury to find that Cabrera and Dietrich knowingly presented false testimony from the Commonwealth's chief witness. Accordingly, this Court should reverse the grant of summary judgment and remand for trial.

*d. A Jury Should Determine Whether Mr. Johnson Is Entitled to Punitive Damages.*

Reading contends that Mr. Johnson "fails to substantially argue [] in his opening brief" punitive damages, and, accordingly, waives his appeal on this issue. Reading Opp. Br. at 47–48. This is wrong. Mr. Johnson raised punitive damages as a separate issue on appeal. Opening Br. at 56. He examined whether a reasonable jury could find that Cabrera and Dietrich acted with reckless or callous disregard of his rights "by suppressing impeachment evidence and fabricating evidence." *Id.* at 4. He repeated that point in his Summary of Argument. *Id.* at 23. He then gave the issue its own section, *id.* at 56, addressing both grounds the district court relied on: that no underlying claim survived, and that the record showed no callous or reckless conduct, (JA28–29.)

Mr. Johnson's incorporation of Points II and III of his Opening Brief by reference is not waiver. Opening Br. at 56. It reflects how the claims are built. Punitive damages are derivative, a point noted by the district court. (JA28)

("Punitive damages are derivative in nature and cannot stand in the absence of a viable claim for liability."). The record evidence that supports the underlying Fourteenth Amendment violations is therefore the same evidence that supports punitive damages. That evidence is set out at length in Points II and III. Opening Br. at 46–56.

The record below presents a triable issue whether Cabrera and Dietrich knowingly presented perjured testimony from Robles, Cintron, and Velazquez while concealing their own criminal activity with Robles. Opening Br. at 50–51. A triable issue also exists concerning whether they suppressed Police Reports Nos. 1–5, which documented Robles' firearms, narcotics, and assault offenses, permitting DA Baldwin to present Robles to the jury as law-abiding. *Id.* at 52. Cintron and Velazquez swore that they were coerced or threatened into implicating Mr. Johnson. *Id.* at 54. Stajkowski described Cabrera as an officer who "would have an informant say whatever he wanted them to say, even if it wasn't true." *Id.* at 53. Cabrera knew Robles led a major drug organization but never told the lead detective. *Id.* at 55. Even after *Gibson*, both detectives continued to withhold the reports and a jailhouse letter while Mr. Johnson remained on death row. *Id.* at 48–49. A reasonable jury could certainly find that this conduct amounted to callous or reckless indifference to Mr. Johnson's constitutional rights.

The district court erred in granting summary judgment on punitive damages. This Court should reverse that ruling and remand for trial.

**CONCLUSION**

For the foregoing reasons, Appellant Roderick Johnson respectfully requests that this Court reverse the district court's order granting summary judgment on the claims challenged in this appeal and remand for trial.

Respectfully submitted,

October 19, 2026

*<u>/s/ William M. McSwain</u>*

William M. McSwain
John J. Soroko
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA 19103
(215) 979-1000

Eric A. Boden
DUANE MORRIS LLP
40 Lake Center Drive
401 Route 73 N, Ste. 200
Marlton, NJ 08053
(856) 874-4200

John M. Pierce
JOHN PIERCE LAW
21550 Oxnard Street, 3rd Flr.
Woodland Hills, CA 91367
(321) 961-1848

Andrew M. Green
Law Offices of Barry M. Wax
701 Brickell Ave. Ste. 1550
Miami, FL 33131
*Counsel for Appellant Roderick Johnson*

## COMBINED CERTIFICATIONS

L.A.R. 28.3(d) CERTIFICATE OF BAR MEMBERSHIP

I certify that I am a member of the Bar of the United States Court of Appeals for the Third Circuit.

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because it contains 5,126 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14 pt. Times New Roman, a proportionally spaced serif typeface.

L.A.R. 31.1(c) CERTIFICATE REGARDING ELECTRONIC FILING

I certify that an electronic version of this brief, in PDF format, was filed; that the text of the electronic version is identical to the text in the paper copies; and that the CrowdStrike version 6.38.15205.0 antivirus protection program was run on the PDF version and no virus was detected.

*/s/ William M. McSwain*

William M. McSwain
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA 19103
(215) 979-1000

## CERTIFICATE OF SERVICE

I certify that I served the foregoing brief on counsel of record for all parties through the Court's Electronic Case Filing system on October 19, 2026.

/s/ Eric A. Boden
Eric A. Boden
DUANE MORRIS LLP
40 Lake Center Drive
401 Route 73 N, Ste. 200
Marlton, NJ 08053
(856) 874-4200